We're ready when you are. This trial took place over 8 days, I counted when reviewing the record there were 15 witnesses. That led to 5 findings of liability and it led 2 years ago to a judgment in our favor, record 4742 and those findings supported that judgment and that is the judgment that we Those 5 findings are what I'd like to use to frame the issues that have been briefed to the court in the extensive submissions by the parties and in particular I would begin in the middle of the 5 submissions, questions 3 and 4 which are the questions that submit these issues of actual notice and deliberate indifference as to which there is dispute in the papers about sufficiency as to which the district court focused on in his analysis of the issue in his J&OV motion and there's a lot of law about this, most involving somewhat different facts, it's a little hard to find a good analogy but what struck me in coming back in and looking at the briefing again and the charge as it was submitted, there's this idea, it's in the judges J&OV opinion, it's in the briefing of our opponents that the actual notice part of it in question 3 and the deliberate indifference part of it in that part of the submission, they're sort of separate, they're sort of siloed and I think that is where the two ships have passed in the briefing that's been submitted to the court. The question of what the district knew and was charged with action upon is not so easily separated from what they failed to do in the acts of deliberate indifference. We have here evidence of written complaints to the administration of the first school that Little T attended about Mr. Evans doing things he ought not be doing and very serious things, things that there is testimony in this record from multiple witnesses, there's cross of course as well, the jury found for us on this, that could be considered abusive with all the connotations that that word holds and in response, they've had a meeting and they wrote a memo, they cite cases about meetings and memos and seek to take refuge there but what that analysis misses is what else was implicated at that time when they had those notices and had those meetings and then resolved to follow up. There is a written policy that the parents are to be notified. Incidentally, I noticed a typo in our brief on the page number for that, it's record ROA 11078 and 7-9, somehow it got scrambled in our briefing. Plain as day, the parents are to be involved when there is harassment and disability is a clearly stated ground of harassment. That did not happen. There is a best practice, a good practice of reviewing this gentleman, watching him in the classroom. The memo talks about acting as if there's a TV camera there all the time. Of course, the best practice is not to say, let's play pretend, it's to send somebody down there. Ms. Hughes, who's the relevant administrator in charge of all this, says that's what they ought to have done. They didn't do it. There's some dispute in the evidence about that but we won. The jury gave credence to our side of that and the record as is presented to this court shows that did not happen either. And finally, this business with this gentleman's personnel file, it was not handled properly, it was not transmitted to the administration of the new school and everyone involved at the new school says I wish I'd known that. These are things that link the actual notice the district had and these written warnings that were given to them with what happened later. They are policies, they are written in some cases, they are acknowledged openly in other cases that show this was serious business. You don't get in a situation where you talk about monitoring a classroom, you don't get in a situation where you're worried about the contents of the personnel file unless it's a big deal. That's the kind of deal that they had, that's the kind of policies they had in place to deal with that and none of them were followed through with. And that foreseeably then set in motion what happened at the next campus. There's part of, I think, the disconnect here, too, in this analysis of the evidence. I read the Verdier in closing, but my opponent, Mr. Brandt, who's an excellent lawyer, and his theme, I hadn't gotten to this when I was working on the briefing originally, but was that we must approach this case with precision. In his cross-examination and in his argument about Ms. Rebecca Bruton, who's the person who wrote the primary of memos and the written warning in the first instance, characterized her in closing as very, very imprecise. But that's the problem. The jury is not tasked with being precise, with giving dictionary definitions to things. They're charged with answering the questions that were put to them. And if one assumes that actual knowledge and deliberate indifference are appropriately submitted, then they were appropriately charged on that and they considered all that evidence and they gave it all the appropriate weight. I've got two other points on this issue. Let me ask you before you leave. Of course. Bruton. Do you want me to grab my cup of water, Your Honor? By all means. I didn't mean to dry your throat quite that quickly. I saw you and I instantly petrified. I do that to a lot of people. Then they hear the question and they say, I didn't need to do that. Among the things that no doubt Mr. Brandt might tell us is that Bruton never told that what was ever intended to harm the child was Bruton's opinion, did not think it was actual physical harm, but did not show respect. I mean, that weight, I think, on Terry means as far as this small piece of the evidence. What's your reaction to that? I don't know if it's just enough to say the jury got it. There must be enough there for the jury to accept. It relates. The examination of Ms. Bruton and the examination of Ms. Hughes, who's the They're both folks no longer with the district. They're off to other sides. And particularly in the case of Ms. Hughes, they kind of have some sympathy on both sides. They have some sympathy for their old employers and for poor little T. And there's a lot of agreeing that goes on, particularly with Ms. Hughes, but some with Ms. Bruton as well. And some of the points Your Honor said are answers given to Mr. Brandt on cross. There are different answers given on direct. There are slight differences in the phrasing. Some of it is a scared person trying to do their best in the courtroom. Some of it is inconsistency. But what Your Honor read is there in the examination of Ms. Bruton. There is other testimony by her talking about what she believes she said in direct. And the jury, it was their task to sort all that out. It's not a summary judgment case where we have one affidavit and we can look and see exactly what was said. This is a human being talking under a lot of stress. She has these handwritten notes. She also gave an oral report. And the net of all that, it's fortunately relatively easy to read. Because she has a fairly limited role in it. But the excerpts that Your Honor cites, like the excerpts from Ms. Hughes' testimony about the administrative issues, there's a lot of back and forth, all of which are jury questions to my way of looking at it. And that issue about the conflicting testimony, Bruton and Hughes in particular, or more accurately, testimony that needed to be weighed, goes to the question of the point in time. And my argument about linkage here, the jury can of course look at any point that's most favorable to us in the light of that we look at this jury verdict. And I'd suggest that they did that, that they took a favorable view of what the district was told, they took a favorable view of the policies, they took a favorable view of what the district then knew, and then looking back, made a decision in light of all that. To go in silo by silo, piece by piece, misses the jury's prerogative to look at all the evidence, and put it into a timeline. That's questions three and four in this issue about notice and deliberate indifference, which an enormous amount of ink was spilled on that in the briefing. One, two, and five deal with the question of intentional discrimination. And coming back to it kind of cold, the difference between intentional discrimination and deliberate indifference is a little elusive, to be honest with you. But that's the difference in legal standard and the difference in some phrasing in some of the cases. Three and four come out of these cases primarily about peer-on-peer abuse from our Supreme Court. Delano Pyle is the case relied upon for one, two, and five. There's an old issue in the briefing about whether or not that is good precedent. I don't want to belabor that here unless the Court has questions about that. I think it's an important issue in that it's the standard by which we need to determine what standard to apply to the evidence that is here. It seems to me your argument in the briefing about Delano Pyle is that it did not properly take into consideration pre-existing Supreme Court opinions, which means we would be second-guessing our precedent that they, it's not an intervening Supreme Court opinion, it's a pre-existing set of Supreme Court opinions. That seems to be a pretty good violation of our rule of orderliness. So I think we need, unless you convince me otherwise, to take Delano Pyle at its word about what the right standard is. Well, I think that I'm an advocate of using Delano Pyle. And I think that the issue, as I understood it in the briefing, was the ADA is enacted in the early 90s, whenever it was enacted. It goes on for a while. Delano Pyle comes in and speaks to the situation of the hearing-impaired fellow that gets stopped. Not long after that, there are these peer-on-peer harassment cases. And then that gets picked up in some circuit law about education. Delano Pyle is never mentioned again. And we come back together in this case. But I see Delano Pyle as an accurate statement of the law at that time. There are questions then about the evolution of the law after that. Now, I could be wrong somewhat about the dates of that. But it seemed to me it was an accurate take on where they stood then, and subsequent development of it was not at issue. If I'm mistaken about the timeline, then I stand to be corrected. But as I understood it, it was sort of a snapshot that then got added onto by further case law. The other thing about Delano Pyle, whether or not there's a question there as to the standard on those third and fourth factors in the charge, there's not a word in Delano Pyle nor in any of these other related cases about whether or not a so-called comparator is required. This is the issue on, if you look at Delano Pyle or an intentional theory. Extra innings came in in the briefing below with the Sixth Circuit case about Gohl, G-O-H-L. But that is a serious issue. It deserves some consideration. The fact that there's no circuit precedent cited on that, I think, is a telling omission. Delano Pyle makes no requirement of that with the gentleman they had there that was having the trouble talking to the police officer. It would have made no sense to do that there, given that fact situation. And that aspect of Delano Pyle is clearly good law. It continues forward. It would make no sense to have such a requirement here where this gentleman only saw people who could not speak and could not go find somebody to use as some kind of a quote-unquote comparator. In addition on this question of whether you need to have a non-disabled person that you compare to, I again refer you to Ms. Bruton's testimony. The district court said in its opinion about this that she had said that she didn't think Mr. Evans was treating people differently because of their disability. But she said otherwise in that same stretch. There's a back and forth depending on how the question is asked. So there is some evidence as to that. And I think every cross-examination of one of the experts or one of the administrators in the case acknowledges sort of the obvious that someone who is unable to respond and speak up and be heard from and acknowledging thus there's a disability that affected how this gentleman was able to treat these people and the ability of this person to speak up unlike other people in the school. So it's a little bit of the obvious, but it's all agreed to and everybody agreed that that was a meaningful distinction. And I don't want to harp on that except to note that it hasn't been adopted in this circuit aside of that goal case. The other thing I would note about that if the court wants to pursue that line of thinking further is that a lot of these cases, and this is a broader point about actual knowledge and deliberate indifference, is deal with a situation where you have something like bullying, where you have a student out there in the population with disabled and non-disabled students freely mixing. Or you have peer-on-peer harassment where peers are in place and you do have to sort of separate out who's getting treated. They don't have a specialized environment like this, and I think that's an important factor to keep in mind as we look at how all this fits together. The other issue about Delano Pyle coming back to that, because it's something I was looking at in reviewing these cases again, to be sure it's been out there for a while doing its thing, being cited and relied upon primarily in district courts, but being cited. But if you look at it, step back and look at it a little bit differently, it's not really in conflict. In this submission, there's 1, 2, and 5 lay out what I call the Delano Pyle theory. 3 and 4 lay out these additional bells and whistles about actual notice and deliberate indifference. I think the court can affirm based on those on sufficiency grounds. But if you fall back to just 1, 2, and 5, that is recognized by lines of authority that talk about intentional disability-based discrimination. And I worded my argument about sufficiency earlier in terms of what the district knew and how it showed it was serious and what their policies were. But the fact the district had those policies, was aware of what was going on, the unique vulnerability of the student, and then just dropped the ball is evidence from which you could infer that. And that is a viable theory and continues to be. In some respects, it's a little bit of a tempest in a teapot. The special rules that came up in these peer-on-peer cases deal with those situations where vicarious liability and scope are particularly important issues. But they're not present here. The Supreme Court has punted on the issue of Article 2 of ADA liability applying here. And that theory, while it hasn't been cited a lot in these school cases, in some respects what Delano Pyle is laying out is a theory of intentional discrimination that has been recognized throughout the land, continues to be recognized, and just hasn't seen a lot of airplay in these school cases because of the specialized rules that have come up for these specialized situations. That doesn't mean the underlying analysis is not still controllable. May it please the Court. Tom Brandt for Keller Independent School District. Judge Means was correct when he granted Keller ISD's judgment as a matter of law because the jury's verdict did not support did not have legally sufficient evidence to support a judgment against Keller ISD under Gebser, Barnes, and Lance and its progeny. I'd like to go through those briefly with you. First of all, Gebser comes out, predates Delano Pyle, of course. But Gebser, Supreme Court rejected, responding at superior liability and opposed an actual notice, deliberate indifference standard under Title IX. What the Gebser court did was they looked at the express remedies, administrative remedies under Title IX and said that the implied remedies would not be different from those. The express remedies required notice to the district of a violation and an opportunity to correct the violation. We are in an implied cause of action here. So what the Gebser court did was they found that in order to have a implied, that you had to have proved deliberate indifference, actual notice, and deliberate indifference to that notice. And it expressly rejected a lower standard because it was concerned that to have a lower standard would mean that the district would be liable for the wrongdoings of its employees directly. And that was explicitly held in Gebser. Barnes, very significant for many reasons. Number one, it predates Delano Pyle. And in footnote three, he disposes completely of the argument that Title II of the ADA does not work like spending clause legislation. Footnote three, Scalia, writing for the majority in Barnes, explicitly rejected Justice Stevens' argument in the dissent that Title II of the ADA shouldn't be treated like spending clause legislation. What he said was these are interlocking statutes, interconnected. It's sort of a difficult graph to follow, but he follows it and says this is what the Title IX and Section, Title VI and Section 504 and Title II of the ADA are all interconnected statutes, interlocking, and that they all require actual notice and deliberate indifference. And that's for the same reason  remedy and the implied remedy. And I mentioned the bank has an argument here about the spending clause. That's completely foreclosed by footnote three in Barnes. Also, the bank refers to the Sheehan case, and that is misplaced. They ignore Barnes, footnote three, and then they say that Sheehan punted on this Title II ADA issue. That was nothing of the sort. It was not reached by the Supreme Court in Sheehan because the Supreme Court said wait a minute, both parties in this case are agreeing that vicarious liability is the norm. We have never decided that issue, and we won't decide it now. So Sheehan did not establish that vicarious liability would be in place. The jury's verdict was precluded by Lance and his progeny. Lance v. Louisville ISD in there, this court applied the actual notice, deliberate indifference standard developed in Title IX case law to Section 504 and Title II ADA claim. This court applied the actual notice, deliberate indifference standard, and then its progeny also did the same. Doe v. Columbia Brazoria ISD, Nevels v. Mart ISD, those two cases applied the actual notice, deliberate indifference standard to peer harassment claims under Section 504 and Title II of the ADA. Then came CC v. Euless Bedford ISD. This court again applied the actual notice, deliberate indifference standard, and that was in a case where there was allegations of intentional discrimination by the school district itself. Lance and his progeny precludes the jury verdict finding against Keller ISD because the evidence showed a pattern of active responses when put on notice of potentially discriminatory conduct. Of course, the other side is saying the evidence is actually, if not to the contrary, at least there is contrary evidence that there wasn't a follow-through after this meeting, that it wasn't monitored and basically nothing happened after the initial meeting with Evans. That was, you're referring to Tedna Taylor's meeting and Hughes' meeting with Evans. What happened was Bruton came with a complaint. It was a complaint that was vague and it had two aspects to it. I'm not getting along with Evans and he's being inappropriate, rough with the kids. Tedna Taylor looked at that. She and Hughes, the supervisor, interviewed Bruton, interviewed, investigated the situation, interviewed Evans, admonished Evans. They didn't find any abuse. They didn't find any issue that was, and abuse was not reported to them. It was reported to a roughness. And then, so they talked to the teacher and they admonished the teacher and then they put that teacher on notice through a written document in his file. So they followed up their meeting with that written document. Now, the issue that you're asking about is the final issue. That is, Tedna Taylor said she followed up. And in that point, I disagree with Judge Means. He thought there was a fact issue there, but I don't think there was. What the testimony was was that the teacher said, I followed up in a way that I would look in occasionally into the room, I'd peek in. And what essentially the testimony was that the teacher Evans and the assistant Bruton never noticed when Tedna Taylor was peeking in. That's not a direct contradiction of the evidence. But even assuming that you take that as a jury in favor of the plaintiff, you still have active response to a situation and then you have Tedna Taylor not perceiving the principal, not perceiving there to be anything seriously wrong here, but actively taking a response to it, following up with a memo, getting a supervisor involved, and then nothing happening after that for two years. So in Tedna Taylor's mind, when she gives the positive recommendation saying, yeah, it'd be fine for Mr. Evans to go on, she's perceiving that she has actually taken care of whatever the problem was by admonishing him, by documenting his file, and moving on. That's what the evidence the jury had before it. And that's why I was saying there was no deliberate indifference there. So you're saying it's beyond the jury's authority, discretion, to weigh the evidence differently than you just did? There's nothing to weigh? No, no. On the issue that I disagree with Judge Means on, I understand... I don't mean that per se, on what Terry Means said, but I'm just indicating that there's a sense that certainly the plaintiffs are trying to put on this, that there was inadequate response to a more serious set of allegations than you are characterizing it. I read probably from your brief to opposing counsel a little while ago your characterization of what Bruton said. There may well be evidence that puts some of that in a different light. And that's obviously the problem whenever you have a JMOL. Our role is to decide is there really not enough here for the jury to have come out the way they did? And you're sort of saying the door is closed, that the only evidence needs to be looked at in the way you just described. We'll have to satisfy ourselves with that. Your Honor, counsel opposite quoted me as talking to the jury about precision, and I'd like to talk about precision again. Because when we're talking about vague allegations and we kind of go emotional and say all this is horrible things are happening. But when you look at what actually the evidence is, that's when the precision comes in. And that's where we go through and we say okay, what happened in April of 2008? Ms. Bruton, a teacher, a teacher's aide, complained about Evans. Taylor immediately investigated, gave oral and written correction to Mr. Evans, and perceived no more problems with Evans. There were no complaints for two years. That's what you have with Bruton. Next, in the fall of 2009, Ms. Rideau expressed concerns about dystonia. Keller ISD immediately responded by monitoring the symptoms, keeping a log of them, and requiring two people to participate in diaper changes. TR's own treating physician testified that the fact that TR was experiencing dystonia did not indicate abuse or misconduct by TR's teachers or anyone else at the school. And in fact, the dystonia was triggered by the therapies and the positional changes that were required of us to perform for two years. So there's the allegation that dystonia could be triggered by anxiety or fear on the part of the boy. Is there any evidence of that? Did anybody testify that fear could trigger the dystonia? No. I mean, the sense was that Evans is abusing the boy, and so when Evans is around him, the fear exists and the dystonia becomes more prevalent at school. The only hard evidence of that would have come from TR's own physician. And he, who was an expert in dystonia, said, no, that's not the way dystonia works. And he also said that little T would not be able to associate some past behavior, alleged past abuse, which was never proven. But he would not be able to make that connection and then say, aha, my diaper's being changed again by this guy who abused me in the past. There's no evidence to connect the two. What you had was that the positional changes is what was testified to. And then also in the October of 2009, KISD established a two-person list policy, a best practice, not a policy, but a best practice. That was for protection of the teachers and the students. In October of 2009, TR receives a bug bite. Well, that's disputed. That is not disputed by any evidence, any medical evidence, because what happened was KISD notified Ms. Rideau, and TR was examined in the hospital. He was diagnosed with a bug bite. He was prescribed antihistamines, and the lump on his head did not have the characteristics of an impact injury. There was no bruising. The jury received no evidence that the lump on TR's head was caused by an impact injury or that it was caused by Mr. Evans. The only medical evidence was that it was a bug bite. I thought they couldn't find any evidence of a red spot or something that indicated to her that it was a bug bite. That was her lay opinion about what that bump on the head was. But the hospital's medical opinion was that it was a bug bite. That was the diagnosis. And then in December of 2009, TR suffered a broken thumb. Ms. Chapa immediately investigates. She did not find any evidence of the cause of the injury or even whether it occurred at school. The jury had no evidence that Mr. Evans caused TR's thumb injury. And their doctors themselves testified that TR's condition lends itself to unexplained injuries because of the quick flailing of the arms. Then on April 1st of 2010, TR experienced sharp pain at the end of a physical therapy session, a therapy session that Mr. Evans was not involved with at all. The school district immediately notified Ms. Rideau and she asked them to examine his body. The nurse and the paramedics, they stripped him to his diaper. They examined him and found no injuries. TR was then taken to the hospital where he was medically diagnosed as constipation and he had recently started, his doctor said he had recently started medication that causes constipation and the laxative treatment effectively treated his pain. On April 8th 2010, Ms. Rideau told Ms. Chapa that she thought Mr. Evans had abused TR. That was the first time there was any allegation of abuse. TR, and she says that TR's knee was dislocated. Chapa immediately investigated, transferred TR to another campus and placed Mr. Evans on protective leave and investigated. Evans never taught TR again and Ms. Chapa reported Ms. Rideau's allegation to Child Protective Services which found no abuse. April, during her investigation in April 2010 is when Ms. Chapa learned that Evans sometimes did not do two person lifts. Ms. Chapa obtained the teacher's resignation and transferred his aide who had not reported his failure to do the two person lifts. Then, from that time, the summer of 2010 until January of 2017 Keller ISD gave TR 100 hours of extra services and an individual aide to help him throughout the school day. These are not the actions of a public entity which is intentionally discriminating against a student on the basis of disability, nor are they the actions of a public entity which is trying to cover up abuse by a teacher. You haven't addressed Delano Pyle. You were leading up to it, I think. Yes, thank you. I'll address Delano Pyle immediately. Two things about Delano Pyle distinguished factually and legally. Number one, Delano Pyle should be held to its facts which are distinguishable from the facts of this case. First of all, this case, like Gebser, Gebser involved claims of discrimination based on abuse by a teacher. That was a sexual abuse case by a teacher. In this case, we're involving allegations of physical abuse by a teacher. Allegations. Before Delano Pyle was decided, the Supreme Court addressed this very type of situation in Gebser and rejected responding at superior liability. Yet Delano Pyle came back. Delano Pyle involved something different. It involved a refusal to provide accommodation during an arrest of a hearing impaired individual, not allegations that the police officer physically abused the arrestee. That's an important factual distinction because the legal analysis for responding at superior would mean that you would have to have the employee under the course and scope of employment. While it can be argued that the officer in Delano Pyle was within the course and scope of his employment when he made decisions about accommodations, it cannot be said that a teacher such as Evans would be within the course and scope of his employment when he allegedly physically abused a student. We don't hire teachers to physically abuse students. Same with the police officer. He might be hired to provide reasonable accommodations during an arrest, but that discretionary call is very distinct from this. So the teacher in Gebser was not within the course and scope of employment, and neither would Mr. Evans be within the course and scope of his employment if they proved that he had abused Bill T. Secondly, legal distinction as to Delano Pyle. I believe it was wrongly decided. It relied on reasoning based... But it was wrongly decided after Gebser and Barnes, and the way it was wrongly decided was the way that Gebser and Barnes definitively told the court what it should do. Gebser and Barnes made the distinction between Title I and Title II of the ADA, for example. The agency principle that gave...the agency language that comes from Title I of the ADA was used in the Delano Pyle decision improperly and was imported into a Title II analysis. That was wrong. We know it's wrong because Gebser and Barnes... We cannot do anything about that. I believe you can. First of all, I think you can factually distinguish Delano Pyle. We can't say that Delano Pyle was wrongfully decided and therefore we're not going to follow it. Well, what you can say is it's distinguishable because of the facts because everything that... Your argument that it's wrongly decided, there's nothing we can do about that. Well, I believe you can even under the rule of orderliness because you have Barnes and Gebser decided before Delano Pyle. That's not the rule of order. But you also have the line of cases of Lance and its progeny, which all go to the actual notice and delivered in different standard. There is a tension between these lines of cases that I outlined. You've got CC, you've got Nevels versus Mark, you've got Doe versus Brasoria, and you've got Lance. All of those cases are saying actual notice and deliberate indifference. You've got an outlier in Delano Pyle and you've got an easy way to distinguish it factually because Delano Pyle, again, involved a failure to accommodate a disability, not an abuse, a physical abuse by the police officer of an arrestee because of a disability. Here, that's distinguishable factually and you can move on without reaching the rule of orderliness or violating the rule of orderliness if that's what the court decides. I want to make this last point in my waning seconds. We have never conceded that the verdict was proper under Delano Pyle. I don't have enough time to go into it, but even if Delano Pyle were to be applied, we believe there was not sufficient evidence of intent and not sufficient evidence of disability-based discrimination. Finally, and I don't think you will have to reach this, I hope, but if you do, I think it's clear that Judge Means did not abuse his discretion when he granted Keller ISD's motion for new trial. With that, my time is up and I thank you very much. Two points I want to make. The first is, just to say it because I've been wanting to say it for 20 minutes, the jury argument that you just heard for the last half of the argument there didn't work with the jury and it should not work here under the standard of review. Virtually every statement of fact that was offered to the court is something that is hotly disputed in this record. I can only hit on a few. This question of, does the initial report rise to the level of abuse? Page 2 of our brief cites you to the testimony of Ms. Bruton on this point and Ms. Hughes on this point. Is there a dispute about it? Sure. Are those words used, though, to characterize what the district knew? Yes. And did you hear a word about the district's response that it believed was appropriate because of the seriousness of the allegations? You did not. They're taking... Well, Hughes again. She says, if I'd only known when this person came to the new campus that would have been a big deal. It's the foreseeable consequence of not washing the guy in the classroom, not documenting the file properly, not getting the parents involved, is this guy can go submarine, get put on a new campus with the exact same group of kids where they have trouble, and then pop back up again. Now, it's two years because school years take a while, and it takes a while for things, for the interaction to play out in the classroom, but viewed under the light most favorable, viewed in terms of the way the district saw its own actions in hindsight, the testimony of Ms. Hughes, the time issue is really of no moment. It's the natural way that things play out during the course of the school year. It's the foreseeable consequence of the decisions made by the district, and Ms. Hughes summarizes that about as well as humans can summarize it. And by the way, Principal Chapa as well agreed with that. That's on page 11 of our brief, some specific record citations there as well. One last thing on this sufficiency issue. The issue of dystonia was mentioned, and I wanted to... Not that it's critical, but it's an important illustration of the issues here. Dr. Sohn's testimony, like Ms. Hughes, like Ms. Bruton, there's some back and forth. You can find a scintilla in there certainly to support our point of view. Page 8 of our briefing talks back into the record on the aspects that we cite there and elsewhere about how dystonia comes to be, how it was noted, Mrs. Rideau's own observations about how her child behaved, and you can look back to those sites and you can find whether it's clash on this issue, whether the jury was entitled to find for us. But I think a good summary of all this is that the district's actions speak louder than the district's words. The jury's entitled to consider all of it, and it did. And the arguments you've heard here are good arguments, but they were jury arguments and they were rejected. Delano Pyle, three points. Number one, there is no tension. There is a line of cases about peer-on-peer harassment and some other unique situations in school law. That's where this issue has come up with these findings three and four have been required. Intentional discrimination under the relevant statutes has always been a theory, Factors I, II, and V. Delano Pyle notes that, and recent cases of this circuit note that. There's been a little crosstalk in between the cases where they haven't necessarily picked each other up, but there's not a tension in the first place. There are just two separate theories, and they all got submitted in this charge. Second question, I'm missing the factual distinction. The factual distinction is there's a claim in Delano Pyle's handling because of his discrimination, unique to him, no situation, no comparator, unique to him. And there have been some other cases earlier and later involving peer-on-peer harassment and peer-on-peer sexual abuse, peer-on-peer bullying, where there have been some special standards developed. That's the case most like ours, is Delano Pyle. And these other additions that have been added on those specific situations has nothing to speak to that. Third point, legally. The ADA, none of this law about intentional indifference and all that or deliberate indifference has anything to do with an ADA claim. We talk about that in our reply brief. But whatever effect that has, Delano Pyle is the first and the last word in this circuit on what the elements of a claim under Section II of the ADA are on analogous facts, not the facts being addressed by these other cases. When you hear the phrase peer-on-peer, it sort of suggests a student harassing a student and not sort of a classic, well, not so much the imbalance, maybe the power imbalance of a teacher harassing a student. Is it peer-to-peer if the harasser was an employee of the school? It certainly is not. Now, there are some cases in this circuit that have involved Lance and whatnot, and Doe, the principal, was hitting on the student, that have involved actions by employees of the school. Even there, there's questions about course and scope and who the person is working for, and that's addressed in the briefing as well. But those are not presented by the Delano Pyle fact pattern and the fact pattern that we have here. Thank you, counsel. That's a further order. 4742. That's our judgment. The Court will take a brief recess. Close your final.